

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-30-2003

# In Re: U.S. West Inc

Precedential or Non-Precedential: Non-Precedential

Docket 02-2479

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"In Re: U.S. West Inc " (2003). *2003 Decisions.* Paper 523.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/523

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 02-2479
_____


IN RE: U.S. WEST, INC. SECURITIES LITIGATION

Lead Plaintiffs Lawrence King, George Karatzas,
Herbert Rothman, and Michael Ferrara, and Plantiff
Adele Brody, on behalf of themselves and all others
similarly situated,
Appellants
(D.C. Civil Nos. 00-cv-00188 & 00-cv-00198)
_____


Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 00-cv-00188)
District Judge: Hon. Roderick R. McKelvie
_____


Submitted under Third Circuit L.A.R. 34.1(a)
April 3, 2003

Before: MCKEE, SMITH, *Circuit Judges*, and HOCHBERG, *District Judge*[*].

(Filed: May 30, 2003)


Joseph H. Weiss, Esq.
Weiss & Yourman
551 Fifth Avenue, Suite 1600
New York, NY  10176

---

[*] Hon. Faith Hochberg, United States District Court for the District of New Jersey, sitting
by designation.

Robert A. Wallner
Milberg, Weiss, Bershad, Hynes & Lerach LLP
One Pennsylvania Plaza
New York, NY 10119

       *Attorneys for Appellant*

Anne C. Foster, Esq.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

       *Attorneys for Appellee*

_____

OPINION OF THE COURT

_____

SMITH, *Circuit Judge*.

Plaintiffs in this matter are two purported classes of investors who held shares in what was U.S. West, Inc. ("U.S. West"), a publicly traded company prior to its June 2000 merger with Qwest Communications International Inc. ("Qwest"). The Plaintiffs contend that the defendants, Qwest and Joseph P. Nacchio, its Chief Executive Officer, are liable to them for unspecified damages pursuant to § 14(a) of the Securities Act and under the common law doctrine of promissory estoppel. Because neither proposed class sufficiently pled facts upon which relief may be granted, the judgment of the District Court granting Qwest and Nacchio's motion to dismiss will be affirmed.

**I.**

On July 18, 1999, U.S. West and Qwest announced a proposed Merger Agreement. Under that agreement, U.S. West shareholders were to receive Qwest shares valued at $69 for each share of U.S. West. The share price was conditioned upon Qwest's average trading price remaining between $28.26 and $39.90 during the period preceding the closing of the merger. The two companies issued a joint Proxy Statement to their shareholders on September 17, 1999, seeking the shareholders' approval of the merger. The Proxy Statement summarized the terms of the merger and attached the Merger Agreement for the shareholders' review. The shareholders of both companies approved the merger on November 2, 1999.

Page I-40 of the Proxy Statement contained the following disclosure summarizing the "no solicitation" covenant of the Merger Agreement.

> NO SOLICITATION. U S WEST and Qwest have agreed that they and their subsidiaries and their officers, directors, employees and advisers will not take action to solicit or encourage an offer for an alternative acquisition transaction involving U S WEST or Qwest of a nature defined in the merger agreement.
>
> Restricted actions include engaging in any discussions with or furnishing any information to a potential bidder, or knowingly taking any other action designed to facilitate an alternative transaction. Qwest or U S WEST, as the case may be, is permitted to take these actions in response to an unsolicited offer, however, if the unsolicited offer is made prior to the time that the U S WEST or Qwest shareholder approval, as the case may be, is obtained . . . .

This provision was based upon Section 5.03 of the Merger Agreement, which detailed

limitations on solicitations of and negotiations with third parties.

Nonetheless, on March 1, 2000, the Bloomberg news service reported that Qwest and Deutsche Telekom were engaged in merger talks. Plaintiffs pled that, following that report, Qwest's shares rose $12 13/16 to a closing price of $59 3/16 a share, while U.S. West's shares purportedly dropped 8% in price to close at $72 a share. On March 3, 2000, The Denver Post reported that Nacchio made statements explaining how Qwest could break off its merger with U.S. West. According to the report, Nacchio stated that "[e]very merger can be intervened on; it only costs money." He was also quoted as saying that "this [merger] is not like at any costs. At the end of the day, I have an obligation to Qwest shareholders to make this deal really worthwhile. . . . I want the merger to go through, but I'm not going to get blackmailed to do dumb business things to make it go through." On March 8, 2000, Deutsche Telekom announced that it had ended negotiations with Qwest. Following the termination of those negotiations, The Wall Street Journal and The Denver Post reported statements by persons opining that Qwest's talks with Deutsche Telekom breached the Merger Agreement with U.S. West. However, U.S. West never declared Qwest in material breach of the Merger Agreement. On June 30, 2000, despite the early March discussions between Qwest and Deutche Telekom, U.S. West and Qwest merged with Qwest as the successor corporation.

Plaintiffs in this action are two professed classes of shareholders alleging to have been harmed by Qwest and Nacchio. Both sets of plaintiffs filed their actions in March of

4

2000.  The plaintiffs of the first purported class alleged that "had [U.S. West shareholders] known of Nacchio's intent not to abide by and not to be bound by the terms of the Merger Agreement, they would not have voted to approve the Merger."  Instead, those shareholders alleged they would have "required that the merger consideration be substantially more favorable for U.S. West shareholders than set forth in the Merger Agreement."  The second class of plaintiffs based their allegations on a theory of promissory estoppel.

With the consent of the parties, the District Court ordered the two separate actions consolidated and appointed lead plaintiffs and lead counsel on September 14, 2001.  An amended complaint asserted claims for relief pursuant to Sections 14(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(a), 78t(a), and state law promissory estoppel.  Therefore, the District Court predicated its subject matter jurisdiction upon 15 U.S.C. § 78aa and 28 U.S.C. § 1331 and 1367.

Qwest and Nacchio brought their motion to dismiss on January 2, 2002.  This appeal is to consider the District Court's decision to grant that motion. *In re U.S. West, Inc. Sec. Litig.*, 201 F. Supp. 2d 302 (D. Del. 2002).  A motion to dismiss is a dispositive motion, the grant of which is final and appealable pursuant to 28 U.S.C. § 1291.  Our review of a district court's grant of a motion to dismiss is plenary. *Malia v. General Elec. Co.*, 23 F.3d 828, 830 (3d Cir. 1994).

## II.

Plaintiffs assert that the Proxy Statement they received in September 1999 was "misleading" and that U.S. West shareholders voted to approve the merger of Qwest and U.S. West based on that misleading document. Section 14(a) of the Securities Act of 1934 makes it unlawful "to solicit any proxy or consent or authorization in respect of any security" "in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78n(a). Those rules and regulations provide:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . .

17 C.F.R. § 240.14a-9(a).

There is a private right of action under Section 14(a) to enforce these regulations, requiring a plaintiff to "show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was 'an essential link in the accomplishment of the transaction.'" *General Elec. Co. by Levit v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992) (quoting *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385 (1970)). However, in order to bring such a claim for relief, a plaintiff must meet enhanced pleading requirements pursuant to the Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, § 21D(b), 109 Stat. 737 ("PSLRA"). Thus, in litigation

6

pursuant to § 14(a), a plaintiff "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Those requirements apply "[i]n *any* private action arising under this chapter in which the plaintiff alleges that the defendant . . . omitted to state a material fact." *Id.* (emphasis added). Furthermore, a plaintiff's "complaint shall state with particularity all facts on which that belief is formed." *Id.*

One of the "elements of a private cause of action for violation of 14(a)" is that a "misstatement or omission was material." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 444 (1976). According to the Plaintiffs, "the Complaint states a claim because the proxy failed to disclose material facts which contravened the proxy's disclosure and misrepresented the parties' intentions;" more specifically, "at the time the proxy statement was disseminated [in September 1999], [Qwest and Nacchio] were not acting in good faith and intended to shop the Company and pursue a competing merger." Plaintiffs' theory of omission and, thereby, recovery is premised on *Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588 (2001). Thus, in addition to showing all the other elements required for a securities violation, prevailing on this theory requires a plaintiff to prove that defendants were (1) "secretly intending from the very beginning not to" comply with the agreement, and thereby (2) affected "the value of a security purchase or the consideration paid." *See id.* at 596-97.

7

Plaintiffs pled no facts from September of 1999 as a basis for their allegations,[1] but solely based their assertions on Nacchio's March 2000 comments to The Denver Post. Based on Nacchio's statements, Plaintiffs believe they "are entitled to the fair and reasonable inference that defendants Qwest and Nacchio, in truth, did not act in good faith and never viewed themselves bound by and never intended to honor the no-shop covenants." While it appears that Nacchio's admitted March 2000 discussions with Deutsche Telekom may then have amounted to a breach of the "No Solicitation" provision of the Merger Agreement, had U.S. West proceeded to act on that apparent breach, we do not agree that those statements can support the inferences required for Plaintiffs' theory, no matter how distasteful we find Nacchio's comments.

Plaintiffs pled that in March 2000 "Nacchio 'explained several times how the two companies could break off the $40 billion merger, if necessary. 'Every merger can be intervened on; it only costs money,' Nacchio said, *noting that the breakup fee for the US West-Qwest deal was $800 million.*'" App. 11 (Pls.' Compl. ¶ 24) (emphasis added). The figure Nacchio is quoted as stating, $800 million, is not without significance. The same Proxy Statement that contained the "No Solicitation" clause also contained the following clause:

TERMINATION FEES (SEE PAGES I-43)

---

[1] We will assume, without deciding, that Qwest and Nacchio's "intent" on September 17, 1999, the date the signatories circulated the proxies to the shareholders, is the point relevant to Plaintiffs' *Wharf* theory, not the date the Merger Agreement was signed.

\*     \*     \*

> Qwest must pay U S West a termination fee of $850 million
> in cash if:

\*     \*     \*

> \-     the merger agreement is terminated by U S WEST as a
> result of Qwest's material breach of its non-
> solicitations in the merger agreement.

App. 57-58.[2] Furthermore, it cannot be disputed that the most onerous requirements of

the "No Solicitation" provision at issue did not become fully effective until shareholder

approval. Prior to shareholder approval, nothing prohibited Qwest from "engaging in any

discussion with or furnishing any information to a potential bidder . . . to facilitate an

alternative transaction," so long as the other potential offer was "unsolicited." App. 92.

Considered in light of the full text of the Merger Agreement contained in the

Proxy Statement, Nacchio's statements are insufficient to give rise to an inference that

Qwest and Nacchio either acted without good faith when entering into and later

circulating the agreement or never intended to comply with the non-solicitation provision.

---

[2] While this part of the Proxy Statement was not quoted in Plaintiffs' complaint, "an exception to the general rule [that courts cannot rely on documents outside the pleadings at motion to dismiss] is that a 'document *integral to or explicitly relied* upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)) (emphasis original). "[W]hat is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited." *Id.* Plaintiffs' claims are obviously premised on the Merger Agreement and other contents of the Proxy Statement.

First, expressly agreeing to a significant penalty for violating the no solicitation provision is inconsistent with the notion that Qwest and Nacchio agreed to the no solicitation provision in bad faith. It would have made no sense for Qwest to agree to such an explicit and expensive remedy for solicitation while, at the same time, acting without a good faith intention to comply with that no solicitation provision.[3]

Furthermore, the specific statements alleged fail to support an inference, as Plaintiffs contend, that "Defendants did not consider themselves bound by the no-shop clause." Quite to the contrary, Nacchio's statements indicate he clearly *did* believe Qwest was bound by the Merger Agreement and its "No Solicitation" provision; Qwest was bound to the tune of about $800 million, and Nacchio noted that very fact. *See* App. 11. Considered in this context, the only inference that Nacchio's statements can provide is that Nacchio believed in September 1999 what he effectively stated in March 2000: if either party materially breaches the agreement by soliciting another merger, resulting in the termination of the U.S. West/Qwest merger, that breaching party would have to pay the other a termination fee of $850 million.

Finally, there is a significant contradiction between the shareholder approval Qwest and Nacchio were allegedly attempting to procure by misrepresentation and the practical effect that same shareholder approval had on Qwest and Nacchio's ability to

---

[3] Qwest and Nacchio must also have been of like mind and have foreseen no other superior business opportunities when circulating the proxies in September 1999 because they proceeded to obtain the shareholder approval that made it far more difficult to solicit other offers.

10

fulfill their alleged "secret intent." Plaintiffs suggest that, although secretly intending to breach the no solicitation provision, Qwest and Nacchio included that no solicitation provision as a contrivance for obtaining shareholder approval. Yet, it was the act of shareholder approval that led to that provision *fully* prohibiting the actions in which Qwest and Nacchio allegedly wanted secretly to engage, effectively eliminating their ability to solicit other offers. It is, quite simply, too much for us to accept that Qwest and Nacchio were falsely including that provision so as to obtain an approval that would actually make it more difficult for them to engage in their desired conduct. Considering these points along with the not insignificant temporal lag and apparently unanticipated interest of Deutsche Telekom in Qwest,[4] we conclude that the statements in question cannot support Plaintiffs' desired inferences under the PSLRA.

Nonetheless, even if one assumes Nacchio had a "secret intent" in September of 1999 to test the limits of the No Solicitation clause if an opportunity availed itself (as it did), *see Wharf*, 532 U.S. at 594, Plaintiffs cannot show the omission of that information was so material as to affect "the value of . . . the consideration paid." *Id.* at 596. An omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. at 449. "Put another way, there must be a substantial likelihood that the

---

[4] Again, it is difficult to conceive of Qwest proceeding with efforts to obtain shareholder approval for that merger in September 1999, thereby making it *more* difficult and expensive for Qwest to pursue other merger options, if Qwest then foresaw other superior merger possibilities.

disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* Plaintiffs cannot make this showing.

While Plaintiffs assert that "the true nature of the West/Qwest transaction was not disclosed to the public shareholders," the presence of the termination fees did have the effect of disclosing to present and future shareholders that risks to the merger remained, risks for which the Plaintiffs reasonably should have accounted. In spite of the "No Solicitation" provision, due to the inclusion of the "Termination Fees" provision, no reasonable investor could have understood from the Proxy Statement that the proposed merger could never be undermined by other solicitations after shareholder approval, only that it would likely take an extremely aggressive bidder willing to bear the $850 million fee. Investors were thereby explicitly notified of the parties "intent" only to be bound to that amount. The termination clause thus served to both mitigate and specifically quantify the risks to the merger from other possible solicitations. Qwest may have "secretly intended" to breach the Merger Agreement if a far better merger opportunity presented itself, but that should hardly have been a surprise. To the extent that Plaintiffs read and relied upon the non-solicitation provision to the exclusion of other provisions in the Proxy Statement as a whole to form a belief that neither side would consider other offers and back out of the merger under any circumstances, that reliance was unreasonable.

Applicable provisions of the PSLRA require plaintiffs to state "the reason or

reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Plaintiffs assert that the Proxy Statement is misleading because, pursuant to *Wharf*, 532 U.S. at 596, Qwest and Nacchio were "secretly intending" never to comply with the agreement and did not consider themselves bound by it. As the facts pled by Plaintiffs not only fail to support that allegation, but, when considered in light of the full Proxy Statement, serve to undermine that inference, Plaintiffs have not pled a claim for relief under the securities regulations.

## III.

The second class of proposed class action plaintiffs asserted that the "No Solicitation" provision of the Merger Agreement is independently enforceable by the shareholders of U.S. West against Qwest and Nacchio by the doctrine of promissory estoppel. Under Delaware Law,

> [t]he elements of a claim for promissory estoppel, which must be shown by clear and convincing evidence, are as follows: "(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only be enforcement of the promise."

*In re Aquila Inc.*, 805 A.2d 184, 193 (Del. Ch. 2002) (quoting *Lord v. Souder*, 748 A.2d 393, 404 (Del. 2000)). Plaintiffs' argument fails to satisfy several of these elements.

As the District Court held, Plaintiffs fail even to establish the prerequisite elements of promissory estoppel as the Proxy Statement was not a "promise . . . to induce

13

action or forbearance," i.e., a contract less consideration, between Qwest and U.S. West's shareholders. *See Lord*, 748 A.2d at 404. The only apparent "promise" here was an agreement which was specifically limited to Qwest and U.S. West, the corporation. App. 146. The mere disclosure of that agreement to U.S. West's shareholders cannot also be said to create a "promise" between the U.S. West shareholders and Qwest and Nacchio where, as here, the disclosed agreement specifically apprised shareholders and third-parties that the agreement was "not intended to confer upon any person other than Qwest [and] U S WEST" rights until after the merger closed. App. 188. It is horn-book law, as well as the law of Delaware, that enforceable contracts require "mutual assent to the terms of the agreement by all parties and the existence of consideration." *Research & Trading Corp. v. Powell*, 468 A.2d 1301, 1303 (Del. Ch. 1983) (citing Restatement (Second) of Law of Contracts § 17 (1979)). Promissory estoppel is generally a "consideration substitute for promises which are reasonably relied upon," and does not abrogate the need to plead the basic contractual element of mutual assent. *See Lord*, 748 A.2d at 400 (citing Corbin on Contracts § 8.12).[5] The District Court rightly considered all the provisions of the Proxy Statement and Merger Agreement in concluding that no enforceable promise to the shareholders existed. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.

---

[5] Mutual assent was clearly present in *Lord*, as the "complaint state[d] that Lord 'disclosed the information related to Souder's improper practices requested by Hagermann, after Lord sought and obtained from Hagermann assurances that if she disclosed such information, she would be protected from any reprisals by Souder.'" *Lord*, 748 A.2d at 399.

"The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce." *Pinter v. Dahl*, 486 U.S. 622, 638 (1988). These disclosures to shareholders, without a pleading of specific facts indicating how these routine disclosures were somehow exceptional, do not also constitute a "promise" between the disclosing corporations and shareholders, especially shareholders who, as here, were informed in those disclosures that they had no rights and *are not even pled to have owned their shares at either the time the merger agreement was signed, the agreement was disclosed, or the merger was approved by shareholders.  See* App. 5 (second class of plaintiffs was those "who held their stock on March 1, 2000"). Plaintiffs cite no authority supporting this vast expansion of liability.

Assuming, *arguendo*, that the disclosure of the provisions of the merger agreement created a "promise" to the *future* shareholders of U.S. West, as plaintiffs here have effectively pled, the second class of Plaintiffs cannot show that they reasonably relied on the "No Solicitation" provision to their detriment. First of all, the agreement included an "ENTIRE AGREEMENT; NO THIRD-PARTY BENEFICIARIES" provision that placed Plaintiffs on notice that there was no promise upon which they could rely. Furthermore, the "Termination Fees" provision, which was fatal to the first class of plaintiffs, is equally fatal to the second proposed class. Nacchio may indeed

15

deserve condemnation for the casual manner in which he publicly dismissed Qwest's commitments; nonetheless, Plaintiffs cannot claim to have been surprised here. By virtue of the "Termination Fees" provision, investors who purchased U.S. West stock on March 1, 2000 should have been aware that the non-solicitation clause was not of unlimited scope. To believe otherwise and fail to account for the risks that remained, risks which the "Termination Fees" provision actually served to both mitigate and quantify, was unreasonable. Thus, the presence of this provision likewise precludes any claim of "promissory estoppel" by the Plaintiffs.

**IV.**

Establishing a § 14(a) securities violation requires a plaintiff to comply with the heightened pleading requirements of the PSLRA and sufficiently plead that any alleged misstatements or omissions would have been material to a reasonable investor. However, when the non-solicitation provision contained in the U.S. West/Qwest Merger Agreement, and reprinted in the Proxy Statement, is read in conjunction with the "Termination" provision in that same Statement, no reasonable investor could believe that the "No Solicitation" clause was absolute or that the merger could never have been undermined by alternate offers. When that provision is further considered in conjunction with Nacchio's actual statement and Plaintiffs' particular legal theory – that Qwest and Nacchio secretly intended not to comply with the non-solicitation clause and did not consider themselves bound by the agreement – those statements actually indicate that Qwest and Nacchio *did* consider themselves bound by its provisions. Plaintiffs'

16

promissory estoppel theory is flawed from the start, as Plaintiffs failed to plead the existence of an enforceable "promise." Furthermore, Plaintiffs' reliance on the non-solicitation clause was unreasonable. The judgment of the District Court will be affirmed.

TO THE CLERK:

Please file the foregoing opinion.

_____     /s/ D. Brooks Smith_____
                                          Circuit Judge

17