THE WHARF (HOLDINGS) LTD. ET AL. *v.* UNITED
INTERNATIONAL HOLDINGS, INC., ET AL.

No. 00-347. Argued March 21, 2001—Decided May 21, 2001

*Paul M. Dodyk* argued the cause for petitioners. With him on the briefs was *William R. Jentes.*

*Louis R. Cohen* argued the cause for respondents. With him on the brief were *Jonathan J. Frankel, David B. Wilson,* and *Jeffrey A. Chase.*

*Matthew D. Roberts* argued the cause for the Securities and Exchange Commission as *amicus curiae* urging affirmance. With him on the brief were *Acting Solicitor General Underwood, Deputy Solicitor General Kneedler, David M. Becker, Meyer Eisenberg, Jacob H. Stillman, Katharine B. Gresham,* and *Susan S. McDonald.*

JUSTICE BREYER delivered the opinion of the Court.

This securities fraud action focuses upon a company that sold an option to buy stock while secretly intending never to honor the option. The question before us is whether this conduct violates § 10(b) of the Securities Exchange Act of

1934, which prohibits using "any manipulative or deceptive device or contrivance" "in connection with the purchase or sale of any security." 48 Stat. 891, 15 U. S. C. § 78j(b); see also 17 CFR § 240.10b–5 (2000). We conclude that it does.

## I

Respondent United International Holdings, Inc., a Colorado-based company, sued petitioner The Wharf (Holdings) Limited, a Hong Kong firm, in Colorado's Federal District Court. United said that in October 1992 Wharf had sold it an option to buy 10% of the stock of a new Hong Kong cable television system. But, United alleged, at the time of the sale Wharf secretly intended not to permit United to exercise the option. United claimed that Wharf's conduct amounted to a fraud "in connection with the . . . sale of [a] security," prohibited by § 10(b), and violated numerous state laws as well. A jury found in United's favor. The Court of Appeals for the Tenth Circuit upheld that verdict. 210 F. 3d 1207 (2000). And we granted certiorari to consider whether the dispute fell within the scope of § 10(b).

The relevant facts, viewed in the light most favorable to the verdict winner, United, are as follows. In 1991, the Hong Kong Government announced that it would accept bids for the award of an exclusive license to operate a cable system in Hong Kong. Wharf decided to prepare a bid. Wharf's chairman, Peter Woo, instructed one of its managing directors, Stephen Ng, to find a business partner with cable system experience. Ng found United. And United sent several employees to Hong Kong to help prepare Wharf's application, negotiate contracts, design the system, and arrange financing.

United asked to be paid for its services with a right to invest in the cable system if Wharf should obtain the license. During August and September 1992, while United's employees were at work helping Wharf, Wharf and United negotiated about the details of that payment. Wharf prepared a

draft letter of intent that contemplated giving United the right to become a co-investor, owning 10% of the system. But the parties did not sign the letter of intent. And in September, when Wharf submitted its bid, it told the Hong Kong authorities that Wharf would be the system's initial sole owner, Lodging to App. AY–4, although Wharf would also "consider" allowing United to become an investor, *id.*, at AY–6.

In early October 1992, Ng met with a United representative, who told Ng that United would continue to help only if Wharf gave United an enforceable right to invest. Ng then orally granted United an option with the following terms: (1) United had the right to buy 10% of the future system's stock; (2) the price of exercising the option would be 10% of the system's capital requirements minus the value of United's previous services (including expenses); (3) United could exercise the option only if it showed that it could fund its 10% share of the capital required for at least the first 18 months; and (4) the option would expire if not exercised within six months of the date that Wharf received the license. The parties continued to negotiate about how to write documents that would embody these terms, but they never reduced the agreement to writing.

In May 1993, Hong Kong awarded the cable franchise to Wharf. United raised $66 million designed to help finance its 10% share. In July or August 1993, United told Wharf that it was ready to exercise its option. But Wharf refused to permit United to buy any of the system's stock. Contemporaneous internal Wharf documents suggested that Wharf had never intended to carry out its promise. For example, a few weeks before the key October 1992 meeting, Ng had prepared a memorandum stating that United wanted a right to invest that it could exercise if it was able to raise the necessary capital. A handwritten note by Wharf's Chairman Woo replied, "No, no, no, we don't accept that." App. DT–187; Lodging to App. AI–1. In September 1993, after

meeting with the Wharf board to discuss United's investment in the cable system, Ng wrote to another Wharf executive, "How do we get out?" *Id.*, at CY–1. In December 1993, after United had filed documents with the Securities and Exchange Commission (SEC) representing that United was negotiating the acquisition of a 10% interest in the cable system, an internal Wharf memo stated that "[o]ur next move should be to claim that our directors got quite *upset* over these representations . . . . Publicly, we *do not* acknowledge [United's] opportunity" to acquire the 10% interest. *Id.*, at DF–1 (emphasis in original). In the margin of a December 1993 letter from United discussing its expectation of investing in the cable system, Ng wrote, "[B]e careful, must deflect this! [H]ow?" *Id.*, at DI–1. Other Wharf documents referred to the need to "back ped[al]," *id.*, at DG–1, and "stall," *id.*, at DJ–1.

These documents, along with other evidence, convinced the jury that Wharf, through Ng, had orally sold United an option to purchase a 10% interest in the future cable system while secretly intending not to permit United to exercise the option, in violation of § 10(b) of the Securities Exchange Act and various state laws. The jury awarded United compensatory damages of $67 million and, in light of "circumstances of fraud, malice, or willful and wanton conduct," App. EM–18, punitive damages of $58.5 million on the state-law claims. As we have said, the Court of Appeals upheld the jury's award. 210 F. 3d 1207 (CA10 2000). And we granted certiorari to determine whether Wharf's oral sale of an option it intended not to honor is prohibited by § 10(b).

## II

Section 10(b) of the Securities Exchange Act makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of

such rules and regulations as the [SEC] may prescribe." 15 U. S. C. § 78j.

Pursuant to this provision, the SEC has promulgated Rule 10b–5. That Rule forbids the use, "in connection with the purchase or sale of any security," of (1) "any device, scheme, or artifice to defraud"; (2) "any untrue statement of a material fact"; (3) the omission of "a material fact necessary in order to make the statements made . . . not misleading"; or (4) any other "act, practice, or course of business" that "operates . . . as a fraud or deceit." 17 CFR § 240.10b–5 (2000).

To succeed in a Rule 10b–5 suit, a private plaintiff must show that the defendant used, in connection with the purchase or sale of a security, one of the four kinds of manipulative or deceptive devices to which the Rule refers, and must also satisfy certain other requirements not at issue here. See, e. g., 15 U. S. C. § 78j (requiring the "use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange"); *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 193 (1976) (requiring scienter, meaning "intent to deceive, manipulate, or defraud"); *Basic Inc.* v. *Levinson*, 485 U. S. 224, 231–232 (1988) (requiring that any misrepresentation be material); *id.*, at 243 (requiring that the plaintiff sustain damages through reliance on the misrepresentation).

In deciding whether the Rule covers the circumstances present here, we must assume that the "security" at issue is not the cable system stock, but the option to purchase that stock. That is because the Court of Appeals found that Wharf conceded this point. 210 F. 3d, at 1221 ("Wharf does not contest on appeal the classification of the option as a security"). That concession is consistent with the language of the Securities Exchange Act, which defines "security" to include both "any . . . option . . . on any security" and "any . . . right to . . . purchase" stock. 15 U. S. C. § 78c(a)(10) (1994 ed., Supp. V); see also *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 751 (1975) ("[H]olders of . . . options,

and other contractual rights or duties to purchase ... securities" are " 'purchasers' ... of securities for purposes of Rule 10b–5"). And Wharf's current effort to deny the concession, by pointing to an ambiguous statement in its Court of Appeals reply brief, comes too late and is unconvincing. See Reply Brief for Petitioners 16, n. 8 (citing Reply Brief for Appellants in Nos. 97–1421, 98–1002 (CA10), pp. 5–6). Consequently, we must decide whether Wharf's secret intent not to honor the option it sold United amounted to a misrepresentation (or other conduct forbidden by the Rule) in connection with the sale of the option.

Wharf argues that its conduct falls outside the Rule's scope for two basic reasons. First, Wharf points out that its agreement to grant United an option to purchase shares in the cable system was an oral agreement. And it says that § 10(b) does not cover oral contracts of sale. Wharf points to *Blue Chip Stamps,* in which this Court construed the Act's "purchase or sale" language to mean that only "actual purchasers and sellers of securities" have standing to bring a private action for damages. See 421 U. S., at 730–731. Wharf notes that the Court's interpretation of the Act flowed in part from the need to protect defendants against lawsuits that "turn largely on which oral version of a series of occurrences the jury may decide to credit." *Id.,* at 742. And it claims that an oral purchase or sale would pose a similar problem of proof and thus should not satisfy the Rule's "purchase or sale" requirement.

*Blue Chip Stamps,* however, involved the very different question whether the Act protects a person who did not actually buy securities, but who might have done so had the seller told the truth. The Court held that the Act does not cover such a potential buyer, in part for the reason that Wharf states. But United is not a potential buyer; by providing Wharf with its services, it actually bought the option that Wharf sold. And *Blue Chip Stamps* said nothing to suggest that oral purchases or sales fall outside the scope of

the Act. Rather, the Court's concern was about "the abuse potential and proof problems inherent in suits by investors who neither bought nor sold, but asserted they would have traded absent fraudulent conduct by others." *United States v. O'Hagan*, 521 U. S. 642, 664 (1997). Such a "potential purchase" claim would rest on facts, including the plaintiff's state of mind, that might be "totally unknown and unknowable to the defendant," depriving the jury of "the benefit of weighing the plaintiff's version against the defendant's version." *Blue Chip Stamps, supra*, at 746. An actual sale, even if oral, would not create this problem, because both parties would be able to testify as to whether the relevant events had occurred.

Neither is there any other convincing reason to interpret the Act to exclude oral contracts as a class. The Act itself says that it applies to "any contract" for the purchase or sale of a security. 15 U. S. C. §§ 78c(a)(13), (14). Oral contracts for the sale of securities are sufficiently common that the Uniform Commercial Code and statutes of frauds in every State now consider them enforceable. See U. C. C. § 8–113 (Supp. 2000) ("A contract . . . for the sale or purchase of a security is enforceable whether or not there is a writing signed or record authenticated by a party against whom enforcement is sought"); see also 2C U. L. A. 77–81 (Supp. 2000) (table of enactments of U. C. C. Revised Art. 8 (amended 1994)) (noting adoption of § 8–113, with minor variations, by all States except Rhode Island and South Carolina); R. I. Gen. Laws § 6A–8–322 (Supp. 1999) (repealed effective July 1, 2001) (making oral contracts for the sale of securities enforceable); § 6A–8–113 (2000 Cum. Supp.) (effective July 1, 2001) (same); S. C. Code Ann. § 36–8–113 (Supp. 2000) (same); U. C. C. § 8–113 Comment (Supp. 2000) ("[T]he statute of frauds is unsuited to the realities of the securities business"). Any exception for oral sales of securities would significantly limit the Act's coverage, thereby undermining its basic purposes.

Wharf makes a related but narrower argument that the Act does not encompass oral contracts of sale that are unenforceable under state law. But we do not reach that issue. The Court of Appeals held that Wharf's sale of the option was not covered by the then-applicable Colorado statute of frauds, Colo. Rev. Stat. §4–8–319 (repealed 1996), and hence was enforceable under state law. Though Wharf disputes the correctness of that holding, we ordinarily will not consider such a state-law issue, and we decline to do so here.

Second, Wharf argues that a secret reservation not to permit the exercise of an option falls outside §10(b) because it does not "relat[e] to the value of a security purchase or the consideration paid"; hence it does "not implicate [§10(b)'s] policy of full disclosure." Brief for Petitioners 25, 26 (emphasis deleted). But even were it the case that the Act covers only misrepresentations likely to affect the value of securities, Wharf's secret reservation was such a misrepresentation. To sell an option while secretly intending not to permit the option's exercise is misleading, because a buyer normally presumes good faith. Cf., e. g., Restatement (Second) of Torts §530, Comment c (1976) ("Since a promise necessarily carries with it the implied assertion of an intention to perform[,] it follows that a promise made without such an intention is fraudulent"). For similar reasons, the secret reservation misled United about the option's value. Since Wharf did not intend to honor the option, the option was, unbeknownst to United, valueless.

Finally, Wharf supports its claim for an exemption from the statute by characterizing this case as a "disput[e] over the ownership of securities." Brief for Petitioners 24. Wharf expresses concern that interpreting the Act to allow recovery in a case like this one will permit numerous plaintiffs to bring federal securities claims that are in reality no more than ordinary state breach-of-contract claims—actions that lie outside the Act's basic objectives. United's claim, however, is not simply that Wharf failed to carry out a prom-

ise to sell it securities. It is a claim that Wharf sold it a security (the option) while secretly intending from the very beginning not to honor the option. And United proved that secret intent with documentary evidence that went well beyond evidence of a simple failure to perform. Moreover, Wharf has not shown us that its concern has proved serious as a practical matter in the past. Cf. *Threadgill* v. *Black*, 730 F. 2d 810, 811–812 (CADC) *(per curiam)* (suggesting in 1984 that contracting to sell securities with the secret reservation not to perform one's obligations under the contract violates § 10(b)). Nor does Wharf persuade us that it is likely to prove serious in the future. Cf. Private Securities Litigation Reform Act of 1995, Pub. L. 104–67, § 21D(b)(2), 109 Stat. 747, codified at 15 U. S. C. § 78u–4(b)(2) (1994 ed., Supp. V) (imposing, beginning in 1995, stricter pleading requirements in private securities fraud actions that, among other things, require that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required [fraudulent] state of mind").

For these reasons, the judgment of the Court of Appeals is

*Affirmed.*