## In re REMEC INCORPORATED SECURITIES LITIGATION,

**This Document Relates to: All Actions.**

No. 04CV1948 JM(AJB).

United States District Court, S.D. California.

Feb. 14, 2006.

Jeff S. Westerman, Milberg Weiss Bershad and Schulman, Los Angeles, CA, David William Mitchell, Lerach Coughlin Stoia Geller Rudman and Robbins, Blake M. Harper, Hulett Harper Stewart, San Diego, CA, for Plaintiffs.

Robert W. Brownlie, Paul Reynolds, DLA Piper Rudnick Gray Cary, San Diego, CA, for Defendants.

## ORDER GRANTING MOTION TO DISMISS; GRANTING LEAVE TO AMEND

MILLER, District Judge.

Defendants Remec, Inc., Ronald E. Ragland, and Winston E. Hickman move to dismiss Plaintiff's second amended federal securities complaint ("SAC"). Plaintiff opposes the motion. Pursuant to Local Rule 7.1(d)(1), this matter is appropriate for decision without oral argument. For the reasons set forth below, the motion to dismiss is granted with 20 days leave to amend from the date of entry of this order.

### BACKGROUND

Lead Plaintiff, the Cuvelier Group, alleges that Defendants Remec, Inc. ("Remec"), its CEO Ronald E. Ragland ("Ragland"), and its CFO Winston E. Hickman ("Hickman") violated the federal securities laws by issuing a series of knowingly false statements concerning Remec's financial condition during the Class Period of September 8, 2003 through September 8, 2004.

Remec is a designer and manufacturer of high frequency subsystems used to transmit voice, video and other data over wireless communications networks and in space and national defense applications. (SAC ¶ 2). The Class Period begins on September 8, 2003 when Remec announced its second fiscal quarter 2004 financial results, for the period ending August 1, 2003. Remec announced increased six month revenue of $167.5 million compared to $112.6 million in the same period of 2003 and losses of $16 million compared to $10.7 million for the comparable period. (SAC ¶ 29). The SAC then sets forth approximately 18 additional statements to the effect that Remec was experiencing increased sales and positive financial results. (SAC ¶¶ 32–59). The SAC then sets forth several additional statements issued on September 8th and 9th that allegedly disclose the goodwill impairment and internal control deficiencies. On September 8, 2004 Remec announced that it was taking a $62.4 million charge for goodwill impairment. Remec announced that it "conducted an impairment analysis of the goodwill associated with our commercial wireless business and determined that it should be written off in its entirety." (SAC ¶ 63). Remec explained that the primary factors contributing to the impairment assessment writeoff "were continued projected losses resulting from industry overcapacity resulting in lower profit margins, and manufacturing cost reductions lagging market price decreases." *Id.* The next day, on September 9, 2004 Remec disclosed that its auditors discovered internal control deficiencies. On September 9, 2004 the price of Remec's stock fell to $4.30 per share, after having reached a Class Period high of $12.86 per share.

In order to explain the nature of the securities fraud, Plaintiff alleges that "[e]ach of the positive statements" failed to disclose the following adverse information: the amount of the goodwill related to "certain acquisitions was overstated by approximately $62 million;" customers "were pulling business back from Remec due to poor performance, quality, and concerns about the stability of the company;" demand for its products was weakening; the Company's assets were overstated because of excess inventory and non-functioning products; the Company was dependent upon the sale of previously written off inventory with a zero cost basis to stave off the appearance of imminent disaster; the Company's gross margins were "decaying;" expenses were higher than anticipated; and the company had material internal control deficiencies. (CAC ¶ 58).

"At the heart of defendants' fraud ... is defendants' failure to timely write-down impaired goodwill which should have been taken at the latest by August 2003, or a full year before it was taken." (SAC ¶ 4). In 25 pages of text and graphics, encompassing approximately 73 paragraphs of allegations, Plaintiffs set forth the perceived deficiencies with Remec's goodwill impairment representations and analysis. (SAC ¶¶ 75–157). The SAC sets forth in substantial detail Remec's public financial disclosures as set forth in the Company's SEC filings, including the Form 10–Q and Form 10–K. The allegations identify that the goodwill impairment analysis implemented by Remec used projected sales growth rates ranging from 5%—15% and gross profit margins ranging from 30%—38%. (SAC ¶ 76). Based upon publicly available information, Plaintiff alleges that from April 27, 2001 through July 30, 2004 at no time did Remec achieve the gross

profit margins used in its good will impairment analysis. Based upon a comparison with Remec's historical financial performance, Plaintiff concludes that the gross profit margins used in the goodwill analysis were "false and misleading" and "not reasonable or supportable." (SAC ¶ 84).

At the beginning of the Class Period, September 8, 2003, "Remec carried approximately $44.1 million of good will attributed to the Commercial Segment in its financial statements." (SAC ¶ 83). At the time of this good will impairment analysis, conducted on December 27, 2002, Remec used a gross profit margin range of 30%—38%. However, the gross profit margins for the three subsequent quarters were 15.8% (4QFY03), 20.2% (1QFY04), and 21.9% (2QFY04). (SAC ¶ 83). Plaintiff alleges that Remec should have written off the entire $44.1 million as of the beginning of the Class Period.

In performing the goodwill impairment test for fiscal 2004 (Remec's fiscal year ends on January 31), Remec assumed gross profit margins ranging from 24%—29%. (SAC ¶ 87). In contrast to the assumed gross profit margin, Remec reported a gross profit margin of –7% for the final quarter of fiscal year 2004, for the period ending January 31, 2004. (SAC ¶ 88). The gross profit margin for the first fiscal quarter of 2005 was 13.5% and – 6.6% for the second fiscal quarter ending July 31, 2004.[1] (SAC ¶ 90).

In short, Plaintiff alleges that the entire goodwill impairment amount should have been recognized much earlier then July 31, 2004 and that Remec's failure to do so violated GAAP and FASB Statement of Financial Accounting Standards. In Remec's second quarter fiscal year 2005 Form 10–Q, filed on September 9, 2004 the

---

1. Although Plaintiff alleges –3.3% gross profit margin for 1QFY05, the opposition acknowledges that this is a typographical error in the SAC and that the correct figure is Remec's reported figure of 13.5%. (Oppo. at p. 8, fn. 8)

Company recognized that "there were indicators of impairment ... as a result of changes in management's assumptions with respect to revenue growth and gross margins." The revised goodwill impairment assumptions lowered sales growth rates ranges to 4%—8% and gross profit margins to 14%—24%. (SAC ¶ 107).

Plaintiff also interviewed several former Remec employees. Based upon these interviews Plaintiff alleges that William Sweeney, Remec's Global Executive Vice President of Sales and Marketing "bullied sales people into providing forecasts of sales that he could 'give to the street' (i.e. forecasts showing growth) although they knew those forecasts could not be met." When those forecasts were not met, Mr. Sweeney "would require them to pull in orders from future quarters to make up the shortfall." (SAC ¶ 158). In this manner Mr. Sweeney would "browbeat" sales people to come back with higher sales. (SAC ¶ 159). Plaintiff also alleges that defendant Ragland would impose the Company's sales objects on the various business units in order "to provide a forecast of anticipated sales opportunities that matched Ragland's number." (SAC ¶ 1612). Defendant Ragland would tell the sales staff "Here are your numbers ... find a way to get there." (SAC ¶ 162). Witnesses confirmed that many of the sales forecasts were "overly optimistic and did not result in actual sales." (SAC ¶ 163).

Plaintiff also alleges that Remec maintained undisclosed excess and obsolete inventory. To achieve growth in sales, Remec purchased several companies during the Class Period, including Paradigm. The acquisitions resulted in overstated inventory assets during the Class Period in the "millions of dollars ... easily over $10 million." (SAC ¶ 167). Plaintiff concludes that the failure to timely write-down obso-

lete of slow moving inventory violated GAAP. (SAC ¶ 176).

Plaintiff also alleges that Defendants violated GAAP by failing to timely write-down obsolete or slow-moving inventory, (SAC ¶¶ 176–181); by improperly assigning Paradigm's inventory assets "no value", but instead, assign[ing] that value to the goodwill associated with the acquisition, (SAC ¶¶ 182–185); and by improperly shipping and recognizing revenue on non-functional products. (SAC ¶¶ 186–188).

Plaintiff also alleges that Defendants failed to maintain an adequate system of internal controls. (SAC ¶¶ 191–199). The internal control deficiencies "made it very difficult for the Company to report reliable and accurate financial results." (SAC ¶ 192). In the Company's September 30, 2004 Form 8–K, Remec disclosed that its auditors, Ernst & Young, had advised the audit committee of certain internal control deficiencies including, lack of review and technical accounting oversight, lack of time reconciliation of bank statements, inability to prepare a mechanized calculation of inventory reserves, and inadequate program and access controls for the Company's information technology processes that support the internal control environment. (SAC ¶¶ 194–195).

## DISCUSSION

### Legal Standards

#### 1. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) dismissal is proper only in "extraordinary" cases. *United States v. Redwood City*, 640 F.2d 963, 966 (9th Cir.1981). Courts should grant 12(b)(6) relief only where a plaintiff's complaint lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory. *See Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1990). Courts should not dismiss

a complaint "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle [the party] to relief." *Moore v. City of Costa Mesa,* 886 F.2d 260, 262 (9th Cir.1989) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990). Courts must construe the complaint in the light most favorable to the plaintiff. *See Concha v. London,* 62 F.3d 1493, 1500 (9th Cir.1995), *cert. dismissed,* 517 U.S. 1183, 116 S.Ct. 1710, 134 L.Ed.2d 772 (1996); *In re Daou Sys.,* 397 F.3d 704, 709–10 (9th Cir.2005). However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a Rule 12(b)(6) motion. *See In re Syntex Corp. Sec. Litig.,* 95 F.3d 922, 926 (9th Cir.1996).

Rule 12(b)(6) "authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Parks School of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995)("a complaint should not be dismissed unless a plaintiff could prove no set of facts in support of his claim that would entitle him to relief").

*2. The PSLRA*

In an effort to curtail the filing of perceived abusive lawsuits, Congress enacted the PSLRA to establish a uniform pleading standard:

**(b) Requirements for securities fraud actions**

**(1) Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

**(2) Required state of mind**

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b).

 Under the heightened pleading standards of the PSLRA, *see In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 974 (9th Cir.1999), Plaintiff must (1) specify each statement alleged to have been misleading and the reasons why the statement is misleading; (2) state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind; and (3) with respect to allegations made on information and belief, state with particularity facts on which the belief is formed. *See Gompper v. VISX, Inc.,* 298 F.3d 893, 895 (9th Cir.2002). Scienter is the "mental state embracing intent to deceive, manipulate or defraud." *Wharf Holdings Ltd. v. United Int'l Holdings, Inc.* 532 U.S. 588, 593, 121 S.Ct. 1776, 149 L.Ed.2d 845 (2001). Under the PSLRA, "the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavora-

ble to the plaintiffs. District courts should consider all the allegations in their entirety, together with any reasonable inferences that can be drawn therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to the requisite inference of scienter." *Gompper*, 298 F.3d at 897. The inquiry into scienter and falsity are generally inferred from the same set of facts, "and the two requirements may be combined into a unitary inquiry under the PSLRA." *Daou*, 397 F.3d at 711.

■ Finally, PSLRA's heightened pleading standards require Plaintiff "to plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics*, 183 F.3d at 974. "[T]o show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity [to commit fraud]." *Id.*

*3. Rule 10b–5*

■ To state a claim under § 10b of the Exchange Act, Plaintiff must allege that defendant (1) made a misrepresentation or omission; (2) of material fact; (3) in connection with the purchase or sale of a security; (4) with scienter; (5) that the plaintiff relied upon; and (6) causing Plaintiff to suffer damages. 15 U.S.C. § 78j(b); *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627, 1631, 161 L.Ed.2d 577 (2005). Rule 10b–5 claims must comply with Rule 9(b) of the Federal Rules of Civil Procedure. *See In re Daou*, 397 F.3d at 710.

**The Goodwill Impairment Allegations**

■ At the heart of Plaintiff's securities fraud SAC is the allegation that Defendants failed to timely write-down goodwill that had become impaired in relation to certain acquisitions. The $62.4 million

write down for impairment in the value of the goodwill allegedly caused Remec's assets and stock prices to be materially overstated.

■ In order to place the goodwill impairment allegations in context, the court notes that Remec's disclosures concerning the assumptions used to analyze the impairment of goodwill are not themselves alleged to be false or misleading. That is, Remec did in fact apply the represented sales growth rates and gross profit margin rates to the goodwill impairment analysis as represented in its public filings. Further the actual sales growth rates and gross profit margins as reported in Remec's SEC filings are not themselves alleged to be false or misleading. Under the fraud on the market theory, "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *Basic Inc. v. Levinson*, 485 U.S. 224, 241, 108 S.Ct. 978, 99 L.Ed.2d 194 (1990). As noted by Plaintiff, "the market for Remec securities promptly digested current information regarding Remec from all publicly-available sources and reflected such information in Remec's stock price." (SAC ¶ 221). Thus, under an efficient market view, the market had assimilated the information regarding projected or estimated future sales and gross profit margin rates (used in the goodwill impairment analysis) as well as the actual, and substantially lower, rates actually achieved by Remec both preceding and during the Class Period.

■ The court has touched upon the efficient market theory only to highlight that the disclosure of accurate financial information does not preclude liability for securities fraud. "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.

For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan & Co. v. Wherehouse Entertainment. Inc.,* 900 F.2d 576, 579 (2d Cir.1990). Thus, to prevail, Plaintiff must demonstrate that the goodwill impairment statements, when read in light of all the information then available to the market, conveyed a material false or misleading impression.

The issue before the court is whether Plaintiff's allegations are reduced to a non-actionable claim of poor business judgment or actionable securities fraud based upon accounting violations coupled with corresponding fraudulent intent. *See Novak v. Kasaks,* 216 F.3d 300, 309 (2d. Cir.2000) (allegations of GAAP violations coupled with corresponding fraudulent intent might be sufficient to state a securities fraud claim). The court begins the analysis by reviewing the requirements under GAAP and FASB 142. GAAP requires that the "goodwill value must be assessed for impairment at least on an annual basis and whenever certain events occur, such as a change in the assumptions that went into calculating the discounted future cash flows." (SAC ¶ 83). The triggering events for a reassessment of goodwill include: (1) a significant decrease in the market value of the asset; (2) a significant adverse change in legal factors or in the business climate that could affect the value of an asset; and (3) a current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with an asset used for the purpose of producing revenue. (SAC ¶¶ 50, 98–100). Remec explained the basis for its goodwill impairment analysis in its 2004 Form 10–K, which provides in pertinent part:

Application of the goodwill impairment test requires judgment, including the identification of reporting units, assigning goodwill to reporting units and determining the fair value of reach reporting unit. Significant judgments required to estimate the fair value of reporting units include estimating future cash flows, determining appropriate discount rates and other assumptions. Changes in these estimates and assumptions could materially affect the determination of fair value and/or goodwill impairment for each reporting unit.... *Our impairment review process is based on a discounted future cash flow approach that uses our estimates of revenue for reporting units, driven by assumed market growth rates and assumed market segment share, and estimated costs as well as appropriate discount rates. These estimates are consistent with the plans and estimates that we use to manage the underlying business. The estimates we used assume that we will gain market segment share in the future and that the Commercial segment will experience continued recovery and a return to growth and profitability from the current trends.*

(SAC ¶ 50).

In an attempt to show that Remec's goodwill impairment analysis was fraudulent throughout the Class Period, Plaintiff alleges that the goodwill impairment analysis performed on December 26, 2003 for Fiscal 2004, ending January 31, 2004, and reported in the Company's 2004 10–K, used unrealistic and inflated assumptions. Remec used assumed—but disclosed—gross profit margins ranging from 24%—29% in the Commercial Segment but reported gross profit margin percentages of 20.2% for 1QFY2004, 21.9% for 2QFY2004, 20.2% for 3QFY2004. (SAC ¶ 88). During this same period of time, Remec assumed sales growth rates ranging from 5%—42% in the Commercial segment. While the

SAC identifies actual sales growth rates outside the Class Period, the court could not locate in the SAC the actual sales growth rates for 1QFY2004 through 3QFY2004. Notwithstanding Plaintiff alleges that the sales growth rate reached high of 9.8% in 4QFY2004. Presumably, the sales growth rate for the first three quarters of Fiscal Year 2004 fell within the lower portion of the 5%—42% range.[2]

Plaintiff alleges that GAAP requires that a goodwill impairment be performed annually and more frequently where circumstances warrant. (SAC ¶ 83). Here, Remec performed the goodwill impairment analysis as of December 26, 2003 and then again seven months later as of July 30, 2004. The court separately reviews the goodwill impairment analysis as of these dates.

*The December 26, 2003 Goodwill Impairment Analysis*

Plaintiff alleges that Remec used unrealistic assumptions to perform the goodwill impairment analysis and therefore committed security fraud. As set forth above, Remec used a projected gross profit margin estimate of 24%–29%. The gross profit margins over the preceding three fiscal quarters were 20.2%, 21.9%, and 20,2%. (SAC ¶ 88). While the actual gross profit margins fell short of the projected lower gross profit range by about 2–4%, and the sales growth rate fell within the lower portion of the estimated range, absent from the SAC's allegations are "facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics*, 183 F.3d at 974. "[T]o show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity [to commit fraud]." *Id.* The

SAC's allegations fall short of establishing a strong inference that the estimates were false, baseless, fraudulent, or unreasonable as the result of deliberately reckless or conscious misconduct. Plaintiff cannot point to the difference between the estimated and actual numbers and simply assume that the difference is attributable to fraudulent conduct. *See In re GlenFed*, 42 F.3d at 1549 ("The fact that an allegedly fraudulent statement and a later statement are different does not necessarily amount to an explanation as to why the earlier statement was false.").

Plaintiff argues that the identified "gross profit margin and sales growth assumptions for the December 2003 test were completely unrealistic," (Oppo. at p. 10:25–26), and lacked "any basis in reality." (Oppo. at p. 10:27). Plaintiff contends that this explains the nature of the fraud because Defendants used "fraudulent assumptions in the face of such contemporaneous information." (Oppo. at p. 11:7–9). Rather than explaining how this is so Plaintiff circuitously reasons that the 2–4% difference between the forecasted and actual gross profit margin manifests the nature of the fraud with respect to goodwill impairment. The court concludes that Plaintiff has not pled with particularity facts giving rise to a strong inference that Defendants acted either intentionally or with deliberate recklessness.

In sum, the court grants the motion to dismiss the securities fraud claim based upon the goodwill impairment allegations as of December 26, 2003.

*The July 30, 2004 Goodwill Impairment Analysis*

Plaintiff alleges that GAAP requires that a goodwill impairment be per-

---

**2.** The court notes that reported sales for Q3FY2004 increased 75% over the prior year quarter and 21% above Q2FY2004 and that sales for Q4FY2004 increased 51% over the prior year quarter. (SAC ¶¶ 41, 48).

formed annually and more frequently where circumstances warrant. (SAC ¶ 83). Here, Remec performed the goodwill impairment analysis as of December 26, 2003 and then again seven months later as of July 30, 2004. Even assuming that Remec violated GAAP by failing to conduct a goodwill impairment analysis earlier than July 30, 2004, Plaintiff must also specifically allege the falsity of the statement as well as fraudulent intent. Plaintiff argues that Defendants "could not have reasonably believed their assumptions were viable or had any basis in reality. Based upon this alone, their statements regarding Remec's financial condition during the Class Period are actionable." (Opposition at p. 10:26–28).

As Remec's financial condition worsened in the last quarter of calendar 2003 and the first half of 2004, Remec experienced declining and even negative gross profit margins of negative 7%. for 4QFY2004, 13.4% for Q1FY2005, and 4.0% for Q2FY2005. Plaintiff argues that "Defendants intentionally or recklessly ignored these historical results," (Oppo.7:20), and therefore "Defendants could not have reasonably believed their assumptions were viable or had any basis in reality." (Oppo.10:26–27). Fatal to Plaintiff's claim is the absence of specific alleged facts explaining how this is so. Plaintiff must "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics*, 183 F.3d at 974. The SAC's scienter allegations, set forth throughout the SAC and at ¶¶ 200–210, consist of boilerplate generalized allegations that the CEO and CFO of a publicly traded company had "receipt of information reflecting the true facts regarding" the Company, (SAC ¶ 200); "knew and/or

recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public," (SAC ¶ 201); "had access to information they needed to monitor the Company's operations and financial figures, particularly that which pertained to any accounting and finance-related matters," (SAC ¶ 202); "had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects and access to internal corporate documents," (¶ 2005); "were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged, were aware, or recklessly disregarded, that the false and misleading statements," (SAC ¶ 206); "were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature of the various public and shareholder and investor reports and other communications." (SAC ¶ 208).

In sum, the allegations resonate with generalities, lacking the specificity required to show the strong inference of scienter required by the PSLRA. While the allegations set forth in the SAC are more prolix and repetitive than the two earlier attempts to state a claim, they similarly lack actionable substance. This is particularly true where Remec made full disclosure of its declining gross profit margins throughout this period of time in its SEC filings and public statements. Plaintiff. must go beyond mere characterization and allege specific facts showing that Defendants possessed the requisite state of mind.[3]

---

3. Plaintiff also alleges that goodwill impairment analysis was based on unreasonable assumptions and conduct. (SAC ¶¶ 84, 104).

However, a Rule 10 b5 claim is based on fraud, not negligence.

The Other Alleged GAAP Violations

*Improper Shipping, False and Unreliable Sales Forecasts, Overstated Revenue Recognition, Inventory Deficiencies and Lack of Internal Controls*

 Plaintiff alleges that Remec experienced internal control deficiencies, (SAC ¶¶ 70, 115–117, 191–199), fraudulently forecasted sales revenue, (SAC 158–164), and sold zero value inventory and non functioning goods and maintained excess and obsolete inventory. (SAC ¶¶ 165–188). "When pleading irregularities in revenue recognition, plaintiffs should allege '(1) such basic details as the approximate amount by which revenues and earning were overstated; (2) the products involved in the contingent transaction; (3) the dates of any of the transactions; or (4) the identities of any of the customers or [company] employees involved in the transactions.' " *In re Daou*, 411 F.3d at 1016. The court notes that many of Plaintiff's allegations are based upon confidential sources, identified as former or current Remec employees. The confidential sources appear to be in a position to have personal knowledge of the events and transactions described in the SAC. Certain of the allegations based upon confidential sources are silent as to the specific time periods and the companies involved in the allegedly improper sales and exaggerated revenue scheme. Notwithstanding, the cited confidential sources add credence to Plaintiff's allegations yet fail in other respects to provide the detail required to put Remec on notice of the allegedly false and misleading accounting violations. The fact that Plaintiff relies heavily on confidential sources does not eliminate or lessen Plaintiff's burden to plead each element of a federal securities claim, including scienter. *See In re Daou*, 411 F.3d at 1015.

Rather than analyze each and every alleged accounting violation, the court reviews the allegations to determine whether Plaintiff has adequately pleaded scienter. The court notes that the SAC provides some specific details regarding revenue recognition and the other accounting issues. For instance, Plaintiff alleges, based upon information received from high level Remec employees, that Defendant Ragland would browbeat sales staff to provide unrealistic sales objectives and that the sales goals "were completely unrealistic and unattainable" and overly optimistic. (SAC ¶¶ 159–164). Plaintiff identifies that Defendant Ragland would provide individual business unit managers with sales goals and the managers were "required to come up with numbers that were equal to Ragland's numbers." (SAC ¶ 161). In explaining why the projections of anticipated future sales were overstated, the SAC explains "that Remec's projections were overstated or inflated due to sales personnel projecting that they foresaw opportunities that did not actually exist, but which they made because of pressure from the Company's senior executives, including Ragland." (SAC ¶ 164).

Plaintiff also alleges that Remec would improperly recognize revenue on products that did not function to the customer's satisfaction. Further, Remec's senior management and sales staff would continue shipments of products that "had yet to perform to customer satisfaction." (SAC ¶ 186). Plaintiff alleges that the amount involved in the shipment "of non-functioning products cumulatively amounted to the 'high hundreds of thousands of dollars' per customer and that there were at least two or three of these customers." (SAC ¶ 186). The court notes that the complaint does not identify the customers or even whether these transactions occurred during the Class Period or whether the amount of "high hundreds of thousands of dollars" is a material amount. The court concludes that these statements fail to par-

ticularly describe the falsity of these statements.

One specifically identified transaction occurred in the fourth quarter of fiscal year 2003 (for the period commencing October 31, 2002) wherein Remec allegedly recognized close to $1 million in revenue with Alamosa Holdings, Inc. Plaintiff explains that the customer was unwilling to accept the Remec installed system at that time, yet improperly recognized the revenue. (SAC ¶ 188). The court notes that this transaction occurred about 10 months prior to the beginning of the Class Period and does not support the claims asserted during the Class Period.

Plaintiff alleges that Remec pursued a "growth-by-acquisition strategy," (SAC ¶ 165), and accumulated large quantities of written-off inventory which it would sell at retail thereby resulting in a 100% margin. (SAC ¶ 182, 185). Plaintiff identifies specific transactions and alleges that for three of the four quarters during the Class Period that about $6 million in pure margin was generated by such sales.

As with the goodwill impairment argument, Plaintiff argues that scienter is adequately pleaded in the SAC because Defendants "must have known" the problems with Remec's accounting system and procedures and the impact of those problems in connection with the Remec's financial condition. Plaintiff argues, alternatively, that Defendant Ragland directly participated in improper recognition practices and/or must have known of the allegedly fraudulent sales forecasting practices, the fraudulent entries into the forecasting computer system, the pervasive policy of selling zero-value inventory, the large amounts of excessive and obsolete inventory, meetings at which senior management told others in attendance that the sales goals could be met selling zero-value inventory, and the inherent unreliability of the BAAN software system (Oppo. at pp.

21: 23–22:3). Plaintiff alleges that the accounting, shipping, inventory and revenue irregularities were made with scienter. The court concludes that these allegations and arguments are insufficient to establish a strong inference of scienter.

One distinguishing characteristic of a strong showing of scienter is that it highlights a mental state embracing a strong intent to deceive, manipulate, or defraud, and serves to separate optimistic statements and or negligent acts from fraudulent ones. Plaintiff's argument in support of scienter is one based primarily on their executive positions within the Company. Plaintiff argues that "it is not plausible that Ragland and Hickman, who were responsible for directing the day-to-day affairs of the Company as CEO and CFO, were not aware" of the fraudulent or misleading accounting and forecasting practices. Plaintiff attributes the difference between the actual internal state of affairs (i.e. the alleged fraudulent or misleading accounting and forecasting practices) and the public statements to knowledge of actual fraud. Plaintiff reaches too far. Plaintiff further alleges that Defendant Ragland bullied the sales staff and pressured them into providing sales numbers that met with his sales forecasts. (SAC ¶¶ 161–162). While these allegations move down the scienter path, they fail to distinguish what is non-actionable bullish conduct from fraudulent or reckless conduct. For example, Plaintiff alleges that Defendant Ragland would cajole sales staff into providing optimistic sales forecasts. "[T]he goals set by Ragland were completely unrealistic and unattainable." (SAC ¶ 162). Plaintiff argues that such direct involvement is particularly probative of scienter but does not explain how this is so. The difficulty with this argument is that the SAC fails to allege facts to explain and distinguish what is optimistic, unrealistic or unattainable. To place Plaintiff's

generalized allegations of optimistic sales forecasts in context the court notes that Plaintiff alleges that Remec was experiencing year-over-year sales growth in the range of 50%–70%. (SAC ¶¶ 38, 41). General allegations to the effect the sales goals imposed by Defendant Ragland were "overly optimistic" or "completely unrealistic and unattainable" fail to distinguish between what may be non-actionable conduct from fraudulent conduct, particularly when the company is experiencing strong year-over-year sales growth of 50–%–70%.

One purpose of the PSLRA's strong inference of scienter requirement is to distinguish between non-actionable and fraudulent conduct by alleging a mental state encompassing an intent to deceive or manipulate. The pleading requirement is not satisfied by characterizing basic facts as optimistic, unrealistic, or unattainable. Plaintiff must "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics,* 183 F.3d at 974; *In re Vantive,* 283 F.3d at 1085 (complaint must allege "contemporaneous facts in sufficient detail and in a manner that would create a strong inference that the alleged adverse facts were known at the time of the challenged statements"). Plaintiff's allegations regarding alleged accounting and forecasting deficiencies fall short of what is required by the PSLRA.

 In light of the dismissal of the SAC's claims, Remec seeks dismissal with prejudice and Plaintiff seeks dismissal with leave to amend. Remec argues that Plaintiff's fraud theory does not make any sense and that each complaint has faired no better than the earlier one. The PSLRA requires a high degree of particularity and detail giving rise to a strong inference of scienter. "This is not an easy standard to comply with—it was not intended to be— and plaintiff must be held to it. But how much detail is *enough* detail? When is an

inference of deliberate recklessness *sufficiently* strong? There is no bright-line rule." *Eminence Capital v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir.2003). In light of the heightened pleading standards, the "drafting of a cognizable complaint can be a matter of trial and error." *Id.* Because the court cannot conclude that there are no circumstances under which Plaintiff can state a claim, the court grants Plaintiff one last opportunity to state a claim that complies with the PSLRA.

In sum, the motion to dismiss is granted with 20 days leave to amend from the date of entry of this order.

**IT IS SO ORDERED.**