In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3593

UNITED STATES OF AMERICA
on the relation of CURTIS J. LUSBY,

*Plaintiff-Appellant,*

*v.*

ROLLS-ROYCE CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:03-CV-0680-SEB/WGH—**Sarah Evans Barker**, *Judge*.

ARGUED MAY 6, 2009—DECIDED JUNE 30, 2009

Before EASTERBROOK, *Chief Judge*, and POSNER and
WOOD, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Curtis Lusby was an
engineer for Rolls-Royce from 1992 through 2001. (He
started at Allison Engine Co., which Rolls-Royce acquired
in 1995.) Lusby worked on the T56 turboprop engine,
which Rolls-Royce has sold to both military and civilian

customers since 1954. He came to believe that Rolls-Royce was not making the parts properly and was falsely telling the United States that the engines conformed to the government's specifications. The Air Force rejected some T56 turbine blades in 1991 as substandard; Lusby concluded that Rolls-Royce had not fixed the problem. He raised this subject within the corporate hierarchy—which responded by firing him. (This is Lusby's version; Rolls-Royce sees matters otherwise.)

Lusby filed suit in 2002, contending that his discharge violated 31 U.S.C. §3730(h), part of the False Claims Act, because Rolls-Royce had penalized him for preparing to bring or support litigation under that statute. The next year Lusby and Rolls-Royce filed a joint stipulation for dismissal. In May 2003, two months before dismissing the first suit, Lusby filed another—this one a *qui tam* action on behalf of the United States. As §3730(b)(2) requires, that filing was under seal. After considering its options for 27 months, the United States declined to intervene in the *qui tam* action, which was unsealed and served on Rolls-Royce in December 2006, after a further 16 months had passed. (The record does not reveal a justification for that additional delay, but Rolls-Royce does not contend that it requires the complaint's dismissal.)

Unhappy that Lusby was still its adversary, Rolls-Royce moved to dismiss the *qui tam* action. The district court granted this motion on the ground that the complaint did not plead fraud with the particularity required by Fed. R. Civ. P. 9(b). 2007 U.S. Dist. LEXIS 94144 (S.D. Ind.

Dec. 20, 2007). Lusby's lawyer drafted a new complaint in an attempt to supply the information that the judge thought necessary. But the court declined to allow the complaint's amendment, ruling that the *qui tam* action is barred by the claim preclusion (res judicata) effect of Lusby's employment suit. 2008 U.S. Dist. LEXIS 69300 (S.D. Ind. Sept. 10, 2008). The judge added that the revised complaint also flunked the test of particularity, so an amendment would have been futile.

The district court's ruling on preclusion has the support of *Cole v. University of Illinois*, 497 F.3d 770 (7th Cir. 2007). Cole filed suit under Title VII of the Civil Rights Act of 1964 and state law, alleging that her race and whistleblowing jointly led to her discharge. After that suit was dismissed with prejudice, Cole tried again under the False Claims Act, presenting both a personal claim under §3730(h) and a *qui tam* claim. We concluded that the first and second suits arose from the same "nucleus of operative fact" (the catchphrase for claim preclusion under federal law). Accord, *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235 (11th Cir. 1999). Rolls-Royce contends that the same result is appropriate here.

Things are not quite so simple, however. Lusby denies a crucial point that Cole conceded: that the two suits involve the same litigants. Claim preclusion under federal law has three ingredients: a final decision in the first suit; a dispute arising from the same transaction (identified by its "operative facts," see *Herrmann v. Cencom Cable Associates, Inc.*, 999 F.2d 223 (7th Cir. 1993)); and the same litigants (directly or through privity of interest). See

*Taylor v. Sturgell*, 128 S. Ct. 2161 (2008); cf. *Bobby v. Bies*, 129 S. Ct. 2145 (2009) (defining the elements of issue preclusion in federal litigation). *Cole* does not discuss the "same party" requirement; given Cole's concession, there was no need to. Nor does *Cole* mention *United States ex rel. Laird v. Lockheed Martin Engineering & Science Services Co.*, 336 F.3d 346, 357–60 (5th Cir. 2003), which noted the difference in the real parties in interest when holding that a personal employment suit does *not* preclude *qui tam* litigation. *Ragsdale* is the same as *Cole* in this respect: neither our court nor the eleventh circuit discussed the effect of the United States' financial interest.

Now that the question has been squarely presented, we join the fifth circuit in concluding that the resolution of personal employment litigation does not preclude a *qui tam* action, in which the relator acts as a representative of the public. The special status of the United States counsels against reflexive transfer of rules of preclusion from private to public litigation. See *United States v. Mendoza*, 464 U.S. 154 (1984) (non-mutual issue preclusion does not apply to suits involving the United States). Cf. *EEOC v. Waffle House, Inc.*, 534 U.S. 279 (2002) (an employee's private disposition, via arbitration, of a claim against an employer does not diminish the federal government's ability to pursue judicial relief independently); *EEOC v. Sidley Austin LLP*, 437 F.3d 695 (7th Cir. 2006) (employee's failure to make a timely charge of discrimination does not prevent EEOC from suing to vindicate interest in law enforcement).

Two principal considerations influence our decision.

First, although the United States is not a "party" to a *qui tam* suit unless it intervenes, it is nonetheless a real party in interest—which is to say that its financial interests are at stake. See *United States ex rel. Eisenstein v. New York City*, No. 08-660 (U.S. June 8, 2009), slip op. 6–7. The United States is entitled to at least 70% of any recovery, even when it does not intervene. 31 U.S.C. §3730(d)(2). It would be inappropriate to snuff out that federal interest just because a potential relator thoughtlessly omitted a *qui tam* claim from a personal suit.

Second, *qui tam* litigation is subject to requirements that make combining it with a personal damages suit awkward. As we have mentioned, a *qui tam* proceeding begins *in camera* and cannot be served on the defendant until the United States has decided whether to intervene. A personal suit, by contrast, must be served on the defendant within 120 days. See Fed. R. Civ. P. 4(m). If the United States does intervene, it may settle or dismiss the action notwithstanding the relator's objection, see §3730(c)(2). Whether or not the United States intervenes, the relator can't dismiss the suit without permission of the United States and the court, see §3730(b)(1).

These rules reflect a legislative view that the United States needs protection from bumbling relators. In an employment suit under Title VII or §3730(h), by contrast, the aggrieved employee is in charge and may pursue, settle, or dismiss the litigation; the plaintiff's errors affect only himself. An ex-employee is free to represent himself in retaliatory-discharge litigation, 28 U.S.C. §1654,

but a relator in a *qui tam* action may proceed only through counsel. See *United States ex rel. Lu v. Ou*, 368 F.3d 773 (7th Cir. 2004). Again this difference reflects the need to protect the interests of the United States. And the United States needs protection not only from *pro se* litigants but also from lawyers whose expertise lies in employment cases, and who without thinking omit *qui tam* claims from their clients' personal suits.

The procedural differences between personal and *qui tam* litigation are so great that it is often impractical to pursue both claims in one suit—and sometimes impossible, as when the United States takes more than 120 days to decide whether to intervene, or the plaintiff wants to proceed *pro se*. As the fifth circuit put it in *Laird*, 336 F.3d at 360, "we do not see convenience in trying the two [claims] together". If joined in a single complaint, they often should be severed under Fed. R. Civ. P. 20(b). And a conclusion that the personal and representative actions *ought* to be conducted separately means that a voluntary decision to file separate suits, as Lusby did, should be respected. Claim preclusion is, after all, a doctrine that has the effect of compelling joinder. A conclusion that joinder usually is not sensible implies a lack of preclusion with respect to claims omitted from the first suit.

The district court sought to protect the public's interest in a different way. After holding that Lusby is precluded from pursuing a *qui tam* action, the court entered an order stating that the dismissal, though with prejudice to Lusby, is without prejudice to the United States. In

other words, the district court held, the United States may pursue a suit under the False Claims Act even if a *qui tam* suit has been filed and lost, and even if that loss blocks actions by other relators (who might have been able to sue as original sources of the information, see 31 U.S.C. §3730(e)(4)(a)). The Supreme Court thought otherwise in *Eisenstein*. The Justices stated that "the United States is bound by the judgment in all FCA actions regardless of its participation in the case." Slip op. 8.

That the United States is bound is why it is a real party in interest. If Lusby had litigated a *qui tam* action to the gills and lost, neither another relator nor the United States could start afresh. The district court deemed this action precluded because, on its view, Lusby's first action presented the same claim as this *qui tam* suit—so, when the judge dismissed the *qui tam* suit with prejudice, Lusby, the United States, and all other potential relators were bound. The United States must protect its interest by intervening in a *qui tam* action rather than by asserting a right to file a False Claims Act suit after the defendant has prevailed. But the United States could not have intervened in Lusby's personal employment suit; it didn't get the statutory notice, and the suit after all did not advance a *qui tam* claim. This is why we think it best to hold that a private employment suit under §3730(h) does not preclude a suit under §3730(a) or (b); then the options of all potential relators and the United States are protected.

This conclusion does not technically overrule *Cole*, which considered only whether a personal and a *qui tam*

claim arise from the same transaction. But as a practical matter our decision means that the outcome of a private employment suit never precludes a *qui tam* action (or a False Claims Act suit directly by the United States). We therefore circulated this opinion before release to all active judges under Circuit Rule 40(e). No judge favored a hearing en banc.

Thus we arrive at the question whether Lusby's latest proposed complaint alleged fraud with particularity—which "means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). See also *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374 (7th Cir. 2003). Lusby contends that Rolls-Royce defrauded the United States about the quality of the turbine blades in the T56 engine. The complaint alleges that five contracts between Rolls-Royce and the United States require all of the engine's parts to meet particular specifications; that the parts did not do so (and the complaint describes tests said to prove this deficiency); that Rolls-Royce knew that the parts were non-compliant (not only because Lusby told his supervisors this but also because audits by Rolls-Royce's design and quality-assurance departments confirmed Lusby's conclusions); and that Rolls-Royce nonetheless certified that the parts met the contracts' specifications. The complaint names specific parts shipped on specific dates, and it relates details of payment. Simple breach of contract is not fraud, but making a promise while planning not to keep it *is* fraud, see *Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588 (2001), and this complaint alleges the

promise, the intent not to keep that promise, and the details of non-conformity. What else might be required to narrate, with particularity, the circumstances that violate 31 U.S.C. §3729(a)(1)?

Rolls-Royce's answer is: the specific request for payment. Lusby has not seen any of the invoices and representations that Rolls-Royce submitted to its customers. He knows about shipments and payments, but he does not have access to the paperwork. The district court held that, unless Lusby has at least one of Rolls-Royce's billing packages, he lacks the required particularity. Since a relator is unlikely to have those documents unless he works in the defendant's accounting department, the district court's ruling takes a big bite out of *qui tam* litigation.

We don't think it essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit. True, it is essential to show a false statement. But much knowledge is inferential—people are convicted beyond a reasonable doubt of conspiracy without a written contract to commit a future crime— and the inference that Lusby proposes is a plausible one. Rolls-Royce's contracts with the United States require the firm to submit, with each request for payment, a form specified by Federal Acquisition Regulation 246–15. The certificate called for by FAR 246–15(d) reads:

> I certify that on [date], the [Contractor's name] furnished the supplies or services called for by Contract No. [number] via [carrier] on [bill of lading] in accordance with all applicable require-

ments. I further certify that the supplies or services are of the quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packaging, packing, marking requirements, and physical item identification (part number), and are in the quantity shown on this or on the attached acceptance document.

If Rolls-Royce submitted such a certificate, knowing the representations to be false, then it committed fraud. See *Hefferman v. Bass*, 467 F.3d 596, 601–02 (7th Cir. 2006); *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999). Lusby contends that Rolls-Royce *must* have submitted at least one such certificate, or the military services would not have paid for the goods, given the contractual (and regulatory) requirement that the FAR 246–15 certificate accompany every invoice.

The district court thought it possible that military procurement officers accepted and paid for the turbine blades without this certificate. That certainly is a possibility—though a remote one. Rolls-Royce submitted lots of invoices. Suppose there were 50, and federal procurement officers overlook the absence of a certificate half the time. The probability that the military would accept 50 shipments in a row without a certificate is 0.5 to the 50th power, a number that has 15 zeros before the first significant digit. The probability that Rolls-Royce never signed a false certificate would be greater if a single slapdash procurement officer handled all of its invoices;

then the errors would not be independent. But even a requirement of proof beyond a reasonable doubt need not exclude all *possibility* of innocence; nor need a pleading exclude all possibility of honesty in order to give the particulars of fraud. It is enough to show, in detail, the nature of the charge, so that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy. See *United States ex rel. Clausen v. Laboratory Corp. of America*, 290 F.3d 1301, 1310 (11th Cir. 2002). Cf. *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Lusby's accusations are not vague. Rolls-Royce has been told exactly what the fraud entails.

To say that fraud has been *pleaded* with particularity is not to say that it has been *proved* (nor is proof part of the pleading requirement). Lusby's complaint may be wrong. Perhaps the parts did comply (Lusby may have been fired for blowing events out of proportion rather than for blowing the whistle on a fraud), or at least Rolls-Royce may have thought that the parts complied. Perhaps Rolls-Royce told the military about the problems independently of the formal certificates. Extended discussions between the military and its suppliers are common. If the military services knew what they were getting and decided to accept blades that Lusby deems "inferior" rather than pay a higher price, then Rolls-Royce will prevail on the merits. No complaint needs to rule out all possible defenses.

One final issue. Lusby argues that Rolls-Royce violated not only §3729(a)(1), which covers false and fraudulent

claims, but also §3729(a)(7), which covers a person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government".[*] After the Air Force detected problems in 1991, it negotiated at length with Rolls-Royce, which in 1999 reimbursed the military for a portion of the purchase price of the defective parts. Lusby's theory is that *all* of the parts were substandard, that Rolls-Royce therefore had an "obligation" to repay everything it had received, and that by keeping even a penny Rolls-Royce violated §3729(a)(7). The district court doubted that Rolls-Royce had a concrete "obligation to pay or transmit money or property to the Government". A dissatisfied customer is a business problem, but how much money changes hands is a matter for negotiation; a federal court ought not step in, declare that there is an "obligation" to rebate some particular amount, and use that as the basis of a penalty under §3729(a)(7). But, like the district

---

[*] An amendment effective May 20, 2009, redesignated §3729(a)(7) as §3729(a)(1)(G) and made some changes to the language. Pub. L. 111-21, 123 Stat. 1621. Section 3729(a)(1), cited earlier, became §3729(a)(1)(A), and §3730(h) became §3730(h)(1). The amendment also adds a definition of the word "obligation." We use the versions that were in force when the events at issue in this suit occurred. Pub. L. 111-21 §4(f) provides that the changes to §3729(a) apply only to conduct after May 20, 2009. (There is an exception for the changes to §3729(a)(1)(B), but that does not affect Lusby's action.) Cf. *Landgraf v. USI Film Products*, 511 U.S. 244 (1994).

court, we need not decide which situations create "obligations" for the purpose of §3729(a)(7), because Lusby does not know what the military and Rolls-Royce said to each other during the eight years of negotiations. The complaint does not offer any reason to think that Rolls-Royce committed fraud during those negotiations. With respect to this claim, therefore, the complaint does not satisfy Rule 9(b).

The judgment of the district court is affirmed with respect to the claim under §3729(a)(7) and otherwise reversed. The case is remanded for a decision on the merits.